NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

NICHOLAS WATERFORD, *Plaintiff/Appellee,*

*v.*

LAURO ARGUIJO SANCHEZ, TLC CUSTOM FARMING COMPANY,
LLC, an Arizona Limited Liability Company, *Defendants/Appellants.*

No. 1 CA-CV 21-0238
FILED 3-17-2022

Appeal from the Superior Court in Yuma County
No. S1400CV201800780
The Honorable Lawrence C. Kenworthy, Judge

**VACATED AND REMANDED**

COUNSEL

Barrett & Matura PC, Scottsdale
By Kevin C. Barrett, Melanie M. Weigand
*Counsel for Defendants/Appellants*

Schneider & Onofry PC, Phoenix
By Charles D. Onofry,
*Counsel for Plaintiff/Appellee*

---

**MEMORANDUM DECISION**

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Randall M. Howe and Judge James B. Morse Jr. joined.

---

**C A M P B E L L**, Judge:

¶1         TLC Custom Farming Company, LLC (TLC) and Lauro Arguijo Sanchez (collectively, the Defendants) appeal from a judgment entered in favor of Nicholas Waterford following a jury verdict. Because the superior court erroneously excluded expert testimony, we vacate the judgment and remand for a new trial.[1]

## BACKGROUND

¶2         Before dawn on a winter morning, Waterford left his friend's house and began driving home in his Ford Mustang. Substantially impaired from an evening of drinking alcohol and smoking marijuana, Waterford drove down several surface streets, entered a state highway, and set his Mustang's cruise control to 60 miles per hour.

¶3         At the same time, Sanchez, a supervisor for TLC, drove a company truck-trailer combination loaded with a forklift toward the state highway. As he approached a highway intersection, Sanchez came to a complete stop at a stop sign. Upon checking in both directions and seeing no highway cross-traffic, Sanchez proceeded into the intersection. While "looking straight ahead," Sanchez saw "a light" approaching in his left peripheral vision and accelerated to clear the intersection. Despite Sanchez's efforts, Waterford's Mustang crashed into the back portion of the trailer.

¶4         Sanchez immediately got out of the truck and ran toward the Mustang. Seeing that Waterford was injured, Sanchez, with the help of another driver, called the police.

---

[1]         We deny Waterford's motion to strike a portion of the Defendants' reply brief discussing assumptions used by Waterford's reconstruction expert. Contrary to Waterford's contention, the Defendants presented the assumptions at issue in both their opening brief and in filings in the superior court.

¶5          When a patrol officer arrived shortly thereafter, the Mustang and the truck-trailer combination were blocking the highway. Initially, the officer "check[ed] the scene" and observed no skid marks to indicate that Waterford had applied the brakes before impact. As he approached the Mustang, the officer noted that it had sustained considerable front-end damage, its headlights were not on, and a strong smell of alcohol emanated from the car's interior. The officer spoke with Sanchez and concluded that he was unimpaired, but had an obligation to yield to oncoming traffic before crossing the highway. *See* A.R.S. § 28-773 ("The driver of a vehicle shall stop in obedience to a stop sign . . . and then proceed with caution yielding to vehicles that are not required to stop and that are within the intersection or are approaching so closely as to constitute an immediate hazard.").

¶6          After medical personnel transported Waterford to a hospital, they drew a sample of his blood. Subsequent testing of the blood sample revealed the presence of marijuana and cocaine and an alcohol concentration of .217. Waterford sustained numerous injuries from the high-speed collision (including a fractured skull, a fractured neck, a collapsed lung, a fractured sternum, three broken ribs, and a broken femur), and when he woke up in the hospital, he only recalled setting the Mustang's cruise control.

¶7          Waterford sued the Defendants, alleging that their negligence caused his damages. After a five-day trial, a jury returned a verdict in Waterford's favor—finding he had sustained damages of $1,250,000 and apportioning 90% of fault to the Defendants and 10% to him.

¶8          The Defendants moved for a new trial, which the superior court denied. The Defendants then timely appealed.

**DISCUSSION**

¶9          The Defendants contend that the superior court erroneously excluded evidence of contributory negligence and improperly instructed the jury, depriving them of their right to present fully a comparative fault defense at trial predicated on Waterford's impairment, excessive speed, and lack of an operational airbag.

¶10          Under Arizona's comparative fault statutory scheme, a "defendant is liable only for the amount of damages allocated to that defendant in direct proportion to that defendant's percentage of fault." A.R.S. § 12-2506(A). For purposes of the statute, fault is "an actionable breach of legal duty, act or omission proximately causing or contributing to

injury or damages sustained by a person seeking recovery, including negligence in all of its degrees." A.R.S. § 12-2506(F).

¶11 Because a comparative fault allegation "is an affirmative defense," the defendant bears the burden of proving that the plaintiff is "actually at fault." *Ryan v. San Francisco Peaks Trucking Co., Inc.*, 228 Ariz. 42, 48, ¶ 22 (App. 2011). To establish fault, the defendant must produce evidence that the plaintiff owed a duty, breached that duty, and that the plaintiff's breach caused, at least in part, injury to the plaintiff. *Id.*

¶12 In this case, Waterford indisputably violated his statutory obligations to drive unimpaired and abide by the posted highway speed limit (55 mph). A.R.S. § 28-1381(A)(1) (prohibiting the actual physical control of a vehicle by a person under the influence of intoxicating liquor or any drug), (A)(2) (prohibiting the actual physical control of a vehicle by a person with an alcohol concentration of 0.08 or greater); A.R.S. § 28-1382(A)(2) (prohibiting the actual physical control of a vehicle by a person with an alcohol concentration of 0.20 or greater); A.R.S. § 28-701(A) (requiring drivers to control the speed of their vehicles "in compliance with legal requirements" and prohibiting the operation of a vehicle "at a speed greater than is reasonable"). The contested issue is whether Waterford's breach of his statutory duties proximately caused or contributed to his injuries. *See Zuern v. Ford Motor Co.*, 188 Ariz. 486, 491-92 (App. 1996) (explaining causation "is a necessary condition precedent to consideration of a person's fault—i.e., the fault must have 'proximately caus[ed] or contribut[ed]' to the claimant's injuries to be considered") (quoting A.R.S. § 12-2506(F)(2)).

¶13 The Defendants challenge the superior court's in limine rulings precluding two defense experts from testifying about Waterford's ability to avoid or mitigate the collision. Contrary to the superior court's findings, the Defendants contend that the experts' opinions were predicated on facts and reliable methodologies.

¶14 We review a superior court's ruling on the admissibility of expert opinion testimony for an abuse of discretion. *Sandretto v. Payson Healthcare Mgmt., Inc.*, 234 Ariz. 351, 356, ¶ 11 (App. 2014). We will uphold the superior court's evidentiary ruling absent an abuse of discretion and resulting prejudice. *Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 506 (1996).

¶15 The admissibility of expert testimony is governed by Arizona Rule of Evidence (Rule) 702, which adopted the language of its federal counterpart and "reflect[s] the principles set forth in" *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Sandretto*, 234 Ariz. at 356, ¶ 11; *see also* Ariz. R. Evid. 702 cmt. The rule allows a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to testify "in the form of an opinion or otherwise" if such testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Ariz. R. Evid. 702(a).

**¶16** In evaluating whether expert opinion will assist the trier of fact, the superior court serves as a gatekeeper, "with the aim of ensuring such testimony is reliable and helpful." *State v. Romero*, 239 Ariz. 6, 9, ¶ 12 (2016) (quoting Ariz. R. Evid. 702 cmt. (2012)). Notwithstanding the superior court's gatekeeping role, Rule 702 does not "supplant traditional jury determinations of credibility and the weight to be afforded to otherwise admissible testimony," nor is it "intended to replace the adversary system." Ariz. R. Evid. 702 cmt. (2012); *see also State v. Bernstein*, 237 Ariz. 226, 229, ¶ 14 (2015) ("The overall purpose of Rule 702 . . . is simply to ensure that a fact-finder is presented with reliable and relevant evidence, not flawless evidence.") (quotation omitted). Rather, "[c]ross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain the "appropriate means of attacking shaky but admissible evidence." Ariz. R. Evid. 702 cmt. (2012). When Rule 702 is implicated, the proponent of the expert testimony bears the burden of showing by a preponderance of the evidence that the testimony is "based on sufficient facts or data" and "the product of reliable principles and methods" that have been "reliably applied . . . to the facts of the case." Ariz. R. Evid. 702(b)-(d); *Bernstein*, 237 Ariz. at 228, ¶ 9.

**¶17** Before trial, Waterford moved in limine to preclude the Defendants' accident reconstruction expert, Joseph Manning, and human factors expert, Michael Kuzel, from testifying that Waterford could have avoided or mitigated the collision. While Waterford did not dispute either witness's qualifications as experts for purposes of Rule 702, he asserted that Manning and Kuzel had relied on unsubstantiated assumptions in formulating their opinions.

**¶18** With respect to Manning, Waterford challenged his opinion that "it may have taken Sanchez upwards of 6.2 seconds" to travel from the stop sign to the point of impact. Waterford argued that certain assumptions rendered this calculation unreliable: (1) applying an acceleration rate of .1 g to the truck-trailer combination rather than the .12 to .14 g acceleration rates applied to heavy trucks by purported reconstruction authorities; (2) using a constant rate of acceleration for the entire distance from the stop sign to the point of impact (63 feet) despite Sanchez's self-reported increase

in acceleration once he perceived a light in his left peripheral vision; and (3) including the 14 feet between the stop sign and the highway's edge in the calculation, notwithstanding Waterford's legal right, as the favored driver, to rely on the assumption that Sanchez would give him the right-of-way up to the point the truck entered the highway intersection. *See Marks v. Goodding*, 96 Ariz. 253, 256 (1964) (holding "one who is driving on a through or favored highway may assume that a motorist approaching from a side road will stop in order to give him the right of way . . . *until such time* as it becomes apparent to him, acting as a reasonable person, that the other motorist does not intend to stop or give him the right-of-way") (emphasis added); *Davis v. Weber*, 93 Ariz. 312, 318 (1963) ("It is the settled law of this jurisdiction that the driver of a vehicle on a favored highway is not necessarily free from negligence in colliding with a vehicle entering from an intersecting street. The fact that the driver on the favored highway has the right-of-way does not relieve him from keeping a proper lookout and yielding the right-of-way, where he can, to another motorist *when the favored driver discovers that the other is not going to yield*.") (emphasis added). According to Waterford, Manning lacked factual and legal bases for employing these assumptions, rendering his "opinion about how long it took Sanchez to travel from the stop sign to the point of impact" unreliable. Furthermore, subtracting the time it took Sanchez to drive the truck the 14 feet from the stop sign to the highway's edge, Waterford countered that "the time available to avoid the accident" was "somewhere in the range of 2.9 to 3.3 seconds," insufficient to allow a reasonable, unimpaired driver, abiding by the speed limit, to avoid the collision.

¶19 Waterford likewise challenged the admissibility of Kuzel's opinion that a reasonably attentive, unimpaired driver in Waterford's position, abiding by the 55-mph speed limit, would have perceived the truck-trailer's "forward movement" within 2.6 to 3.2 seconds and begun hard braking (3.6 seconds to stop), thereby substantially decelerating or stopping the Mustang before impact (within 6.2 to 6.8 seconds). First, Waterford argued that Kuzel's opinion was wholly "irrelevant and meaningless" absent a reliable opinion that Waterford had 6.2 to 6.8 seconds to stop, and because Manning's calculation was based on faulty assumptions, it failed to provide a reliable predicate. Second, Waterford questioned Kuzel's calculation of a reasonable driver's perception and reaction time, asserting that because Kuzel used another expert's regression equation rather than formulating his own, the opinion was unreliable. Third, Waterford objected to Kuzel's assumption that the roadway's coefficient of friction was .7 when asphalt has a coefficient of friction range from .55 to .90 and Kuzel failed to test the condition of the actual highway's surface. Finally, Waterford contended Kuzel's opinion that a reasonable

driver in Waterford's position could have or nearly could have stopped, without any accompanying opinion as to which injuries could have been avoided at a reduced speed, was too equivocal and meaningless to "assist the trier of fact in determining whether [Waterford] could have avoided the accident" or injuries.

¶20        In response, the Defendants argued that Manning and Kuzel based their opinions on the factual record and the application of reliable methodologies, not unfounded assumptions. Pointing to similar assumptions Waterford's accident reconstruction expert applied (using an average acceleration rate of .08 g and a .7 g coefficient of friction to calculate that 6.8 seconds elapsed between the truck-trailer commencing from the stop sign and reaching the point of impact), the Defendants asserted that presentation of their experts' testimony through the adversarial system would allow a jury to assess credibility and determine the weight, if any, to afford the opinion evidence. Addressing some of Waterford's specific objections, the Defendants denied that Kuzel improperly used (1) a regression equation and program developed by a "well recognized . . . leader in th[e] field," and (2) a .7 g coefficient of friction when .7 g reflects the average of the undisputed coefficient of friction range.

¶21        After full briefing and oral argument, the superior court granted Waterford's request to preclude expert opinion testimony "relating to how long" he had to stop before impact and whether he could have reasonably avoided the accident. On the Defendants' motion to reconsider, the superior court affirmed its in limine rulings, finding that Manning and Kuzel had "guess[ed] on some fairly important facts" and admonishing that the Defendants were precluded from raising "the avoidability issue" at trial. The court also clarified other pretrial rulings, stating that evidence of Waterford's impairment was admissible only for the limited purpose of proving he drove without headlights before the accident and evidence of his excessive speed and lack of a functioning airbag was admissible only to demonstrate the unreasonableness of his failure to wear a seatbelt, not as stand-alone bases for comparative fault.

¶22        Given the superior court's in limine rulings, the trial issues were limited to whether Waterford drove the Mustang without headlights, thereby absolving the Defendants of liability for Sanchez's failure to yield, and the extent to which Waterford's failure to wear a seatbelt contributed to his physical injuries. *See* A.R.S. § 28-922 (requiring all vehicles "on a highway" to "display lighted lamps and illuminating devices" at "any time from sunset to sunrise and at any other time when there is not sufficient light to render clearly discernible persons and vehicles on the highway at a

distance of five hundred feet ahead"); A.R.S. § 28-909(A)(1) (requiring "[e]ach front seat occupant of a motor vehicle" to "[h]ave the lap and shoulder belt properly adjusted and fastened while the vehicle is in motion"); *see also Law v. Superior Court*, 157 Ariz. 147, 157 (1988) (recognizing "the seat belt defense as a matter which the jury may consider in apportioning damages due to the 'fault' of the plaintiff").

**¶23**　　　　The record does not support the superior court's finding that Manning and Kuzel, in large part, simply "guess[ed]." To the contrary, the record reflects that the defense experts formulated their opinions by applying reliable principles and methodologies to the facts, satisfying Rule 702's reliability threshold requirement. *See State ex rel. Montgomery v. Miller*, 234 Ariz. 289, 298, ¶ 23 (App. 2014) ("While the expert's methodology must be based on more than speculation, its reliability need not be established to a degree of scientific certainty.").

**¶24**　　　　As detailed in the Defendants' offer of proof, Manning applied a .1 g (13.7 mph at impact) acceleration rate based on the weight of the truck-trailer combination (loaded with a forklift) compared to the weight of a typical passenger vehicle (generally accorded a .2 g acceleration rate). Notably, the .1 g acceleration rate was also consistent with Sanchez's estimate that the truck-trailer traveled at 12 mph at impact. As further explained in the offer of proof, Kuzel applied a 2.6-to-3.2 seconds perception and reaction time range and determined that a reasonably attentive, unimpaired driver traveling no faster than the posted speed limit would have engaged hard braking within 3.2 seconds of the truck-trailer resuming forward movement from the stop sign. Relying on Manning's calculation that the truck-trailer traveled from the stop sign to the area of impact in 6.2 seconds, *see State v. Lundstrom*, 161 Ariz. 141, 147 (1989) ("A testifying expert may rely on the opinions of other experts if such reliance is the kind of material on which experts in the field base their opinions.") (internal quotation marks omitted), Kuzel concluded that a reasonably attentive driver would have braked for at least 3.6 seconds at .7 g (using an approximate average of the undisputed coefficient of friction range), thereby substantially reducing the Mustang's speed before impact. Because Sanchez reported he heard no braking and the police report documented no evidence of braking on the highway, Kuzel concluded that Waterford did not respond in a reasonably attentive manner due to his impaired cognitive functioning.

**¶25**　　　　"Questions about the accuracy and reliability of a witness' factual basis, data, and methods go to the weight and credibility of the witness' testimony and are questions of fact . . . [that do] not turn on the

judge's preliminary assessment of testimonial reliability. It is the jury's function to determine accuracy, weight, or credibility." *Pipher v. Loo*, 221 Ariz. 399, 404, ¶ 17 (App. 2009) (quoting *Logerquist v. McVey*, 196 Ariz. 470, 488, ¶ 52 (2000)).

**¶26**      To the extent Waterford disagreed with the experts' opinions, he could have challenged both Manning and Kuzel on cross-examination concerning the application of a constant .1 g acceleration rate, the inclusion of the distance (14 feet) between the stop sign and the edge of the highway, and the use of an average rather than precise coefficient of friction in the calculation. *See Sandretto*, 234 Ariz. at 359, ¶ 24 (explaining challenges to expert testimony "based on isolated portions" of the expert's opinion "does not present a Rule 702 argument; rather, it is a jury argument going to the weight and credibility of the testimony"). Waterford also could have questioned Kuzel regarding his use of another expert's regression equation, but Kuzel's reliance on the equation in reaching his own conclusion did not render his opinion inherently unreliable. *See State v. Smith*, 215 Ariz. 221, 228, ¶ 23 (2007) ("Expert testimony that discusses reports and opinions of another is admissible under [Rule 703] if the expert reasonably relied on these matters in reaching his own conclusion."). Moreover, Waterford could have presented competing expert opinion testimony, although we note that his accident reconstruction expert relied on similar assumptions and utilized some of the same methodology. Finally, contrary to Waterford's contention that expert opinion regarding avoidability was irrelevant absent precise evidence identifying which damages could have been mitigated, A.R.S. § 12-711 permits a jury to find a defendant "not liable if the defendant proves that the claimant . . . was under the influence of an intoxicating liquor or a drug and as a result of that influence the claimant was at least fifty percent responsible for the accident or event that caused the claimant's harm."

**¶27**      Simply put, expert opinion testimony is not inadmissible merely because the opposing party disagrees with some of the experts' underlying assumptions or the conclusions drawn. Rather, when expert opinion testimony is predicated on facts and reliable principles, objections to the testimony may be raised through robust cross-examination, allowing the jury, as fact-finder, ultimately to decide whether the expert's opinions are credible. *See Montgomery*, 234 Ariz. at 298, ¶ 20 ("In evaluating admissibility, courts must remain cognizant of the separate functions of judge and jury."); *see also Bernstein*, 237 Ariz. at 229, ¶ 14 ("Rule 702(d) must be interpreted and applied with some flexibility to encompass the multitude of scenarios that may be presented and to maintain the division in function between the fact-finder and gatekeeper.") (internal quotation

marks omitted); *Elosu v. Middlefork Ranch Inc.*, 21-35309, 2022 WL 534345, at *5, 6, 9 (9th Cir. Feb. 23, 2022) (concluding the trial court improperly "assumed a factfinding role" by excluding an expert's report on the basis it was "too speculative," explaining that "while a court may reject wholly speculative or unfounded testimony, it abuses its discretion if it overlooks relevant data submitted as the foundation of an expert's remarks"). Because it is "not always" clear whether "errors in application render evidence unreliable," in "close cases, the [superior] court should allow the jury to exercise its fact-finding function, for it is the jury's exclusive province to assess the weight and credibility of evidence." *Bernstein*, 237 Ariz. at 230, ¶ 18.

**¶28**       Given the nature of the opinions proffered in this case, the jury, as fact finder, must weigh and assess the accuracy and reliability of the defense experts' testimony. *Pipher*, 221 Ariz. at 404, ¶ 17. The question, then, is whether the erroneous exclusion of its experts' opinion testimony prejudiced the defense.

**¶29**       The test is whether the jury would have returned the same verdict had the precluded evidence been admitted. *Groener v. Briehl*, 135 Ariz. 395, 398 (App. 1983) (explaining an erroneous ruling on the admissibility of opinion testimony "is reversible if the reviewing court is unable to conclude that the jury would have reached the same verdict" absent the error). Because admission of the excluded testimony regarding avoidability and mitigation would have permitted the Defendants to argue comparative fault based on Waterford's impairment and excessive speed—that an unimpaired, reasonable driver traveling at a speed no faster than the posted speed limit would have had the time and distance to avoid or substantially mitigate the collision—it could have changed the jury's apportionment of fault. Accordingly, we vacate the judgment in favor of Waterford and remand for a new trial. Given this resolution, we need not address the Defendants' other claims of trial error.

## CONCLUSION

¶30 For the foregoing reasons, we vacate the judgment and remand for a new trial.



AMY M. WOOD • Clerk of the Court
FILED: AA