NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

ROY MCALISTER, et al., *Plaintiffs/Appellants*,

*v.*

LOEB & LOEB, LLP, *Defendant/Appellee*.

No. 1 CA-CV 23-0212
FILED 2-1-2024

Appeal from the Superior Court in Maricopa County
No. CV2018-012158
The Honorable M. Scott McCoy, Judge

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART**

COUNSEL

The Entrekin Law Firm, Phoenix
By B. Lance Entrekin
*Co-Counsel for Plaintiffs/Appellants*

Ahwatukee Legal Office P.C., Phoenix
By David Abney
*Co-Counsel for Plaintiffs/Appellants*

Fennemore Craig P.C., Phoenix
By Jessica Post, Amy Abdo, Brett Gilmore
*Counsel for Defendant/Appellee*

## MEMORANDUM DECISION

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Kent E. Cattani and Judge Anni Hill Foster joined.

**C A M P B E L L**, Judge:

¶1          Plaintiffs Roy and Kathleen McAlister, and McAlister Technologies, L.L.C. (MT), appeal from the superior court's exclusion of their lost-profits damages expert, and its entry of summary judgment for defendant Loeb & Loeb L.L.P. on damages as well as on the plaintiffs' trespass to chattel and slander of title claims. We hold that the court appropriately excluded the expert's opinions regarding damages because they were based on speculation and unreliable methodology. We therefore affirm the expert's exclusion and summary judgment on damages in major part.

¶2          But we hold that summary judgment was not warranted as to a portion of the claimed damages premised on a proposed initial payment from a potential investor, or as to the trespass to chattel and the slander of title claims. We therefore reverse and remand the summary judgment on damages to address the proposed initial-payment portion only, and we reverse and remand the summary judgment on the trespass to chattel and the slander of title claims.

## BACKGROUND

¶3          Roy McAlister is a green-energy scientist and inventor. In 2009, he formed MT for the purpose of holding and licensing his patents. Around the same time, he also helped form Advanced Green Technologies, LLC, (AGT) for the purpose of commercializing his innovations.[1] He was a minority owner of AGT and its chief technology officer.

---

[1]     The parties sometimes refer to a company called Advanced Green Innovations (AGI). According to McAlister and MT, AGI is an operating company and investment vehicle for AGT. We refer herein to both companies as AGT.

## I. McAlister and MT's Dealings with AGT

¶4 Soon after their formation, MT and AGT entered a "License Agreement" whereby AGT obtained an interest in much of McAlister's green-energy intellectual property for the purpose of developing it for commercial use. (The exact nature of the interest obtained by AGT was later disputed.)

¶5 Through an affiliate, AGT entered at least one distributorship agreement for a yet-to-be-commercialized injector that would run on either natural gas, hydrogen, or another listed fuel. But AGT was never able to commercialize any product in more than five years of operation, and it eventually declared bankruptcy.

¶6 In late 2014, AGT replaced its outside patent-prosecution counsel (which also represented MT) with the law firm of Loeb & Loeb. Though McAlister also contemplated changing MT's counsel to Loeb & Loeb, he ultimately continued to retain the previous joint counsel.

¶7 Conflict between McAlister and AGT arose. Ultimately, AGT decided to abandon its efforts to commercialize McAlister's inventions and, consequently, its prosecution of his intellectual property. In April 2015, AGT agreed to make a one-time payment to preserve some of MT's patent applications with looming renewal deadlines. Patent prosecution work was pursued in May and June.

¶8 In late May, McAlister notified AGT that it had materially breached the "License Agreement" by abandoning patent prosecution without proper notice. When AGT did not respond, McAlister sent a letter to AGT in late June stating that he and MT were terminating the agreement immediately.

¶9 According to AGT, and disputed by McAlister and MT, the "License Agreement" gave AGT non-terminable ownership rights to the patents. So, in August, AGT directed Loeb & Loeb to replace MT's name with AGT's on numerous patent applications. Loeb & Loeb complied.

¶10 Meanwhile, McAlister, believing he owned the patents, began talking to potential investors about licensing the patent portfolio. McAlister alleges that when he and the potential investors discovered that the intellectual property was held by AGT following the re-naming, the potential investors declined to move forward with any of the prospective deals.

## II.  AGT Litigation

¶11        McAlister and MT thereafter brought an action against AGT regarding the ownership of the intellectual property. In 2019, after years of litigation, the parties stipulated to a dismissal of that case with no resolution of the substantive issue.

## III.  Loeb & Loeb Litigation

¶12        In 2018, McAlister and MT filed this suit against Loeb & Loeb for breach of fiduciary duty, negligent supervision, aiding and abetting, trespass to chattel, and slander of title.[2] The plaintiffs proffered Ron Epperson as their expert on damages. As the case evolved, Epperson prepared multiple reports (a preliminary one in 2014, a second one in 2019, and a supplemental one in 2021) and was deposed by opposing counsel.

¶13        The superior court first granted Loeb & Loeb's motions for summary judgment on the trespass to chattel and slander of title claims, and then granted its motions for Epperson's exclusion (on the basis that his opinions were speculative and unreliable) and for summary judgment on damages. McAlister and MT thereafter admitted that they sought no damages other than lost profits, so the superior court entered a case-dispositive judgment in Loeb & Loeb's favor. The plaintiffs then brought this appeal challenging the summary-judgment and expert rulings.

### DISCUSSION

## I.  Waiver

¶14        We first address Loeb & Loeb's contention that the plaintiffs have waived arguments related to the entry of summary judgment on damages. In the proceedings below (and in their opening brief on appeal), the plaintiffs focused their defense to summary judgment on the validity of Epperson's opinions. In their reply brief and at oral argument the plaintiffs asserted that summary judgment was inappropriate, even with the preclusion of Epperson's opinions, because the evidence underlying those

---

[2]        Earlier in 2018, McAlister and MT brought an action in California federal court against Loeb & Loeb for professional negligence, slander of title, and trespass to chattel. According to Loeb & Loeb, that action was dismissed for lack of subject matter jurisdiction.

opinions—in particular, one of the potential investors' testimony that he was willing to make a contingency-free initial payment—created a genuine issue of material fact regarding lost profits.

¶15 "On appeal from a summary judgment, parties are not allowed to advance new theories or raise new issues in order to secure a reversal." *Contempo Constr. Co. v. Mountain States Tel. & Tel. Co.*, 153 Ariz. 279, 282 (App. 1987). But as a matter of law, expert testimony is not required to show lost profits that are easily calculable. *E.g.*, *Meaux Surface Protection, Inc. v. Fogelman*, 607 F.3d 161, 170–71 (5th Cir. 2010) (holding under Texas law that unless highly technical issues are involved, expert testimony is not required to show reasonably certain lost profits). The plaintiffs did not previously focus on the evidence of damages separate from Epperson's analysis, or focus on the portion of the evidence regarding the one investor's willingness to make an initial payment. But by advancing that legal principle now, the plaintiffs are not changing their damages theory or raising new issues—they are relying on the same evidence, just without the expert's imprimatur. Even though they did not emphasize the "initial payment" testimony in the proceedings below, Epperson not only described this potential payment in the body of his report, but he also credited it in his calculations. Because evidence of the potential "initial payment" was before the court, we decline to find that the plaintiffs have waived the argument that this evidence alone precluded summary judgment.

¶16 We are unpersuaded by Loeb & Loeb's contention that the plaintiffs disclaimed the "initial payment" argument when they acquiesced to Loeb & Loeb's post-summary-judgment motion in limine. The motion in limine called for the preclusion of "evidence of any damages *other than* the purported lost-profits theory." (Emphasis added.) The plaintiffs filed a notice of non-opposition in which they stated that they would "not seek to offer at trial evidence of damages outside of the lost profits damages," but they expressly stated that they were *not* waiving any objection to Epperson's exclusion or to the grant of summary judgment on lost-profit damages. We conclude that a lost-profits inquiry must necessarily include consideration of the potential "initial payment," an allegedly non-speculative payment that was not contingent on any future development, production, or productivity measures.

## II.    Exclusion of Lost-Profits Damages Expert

¶17 Under Arizona law, a party may recover lost profits from a new venture if the circumstances show that lost profits were reasonably

certain to occur—with the fact of lost profits (at issue here) requiring more rigorous proof than the secondary issue of their amount. *Rancho Pescado, Inc. v. Nw. Mut. Life Ins. Co.*, 140 Ariz. 174, 184, 186 (App. 1984). We review the court's rulings on the admissibility of expert testimony for abuse of discretion, even when they intersect with summary-judgment questions. *Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 387, ¶ 30 (2013).

**¶18**　　　　When considering whether a venture would have been profitable, the claimant's industry history may be relevant. *See Short v. Riley*, 150 Ariz. 583, 586 (App. 1986) (holding that jury could consider lost profits where restauranteur plaintiff had significant industry experience and had previously operated the at-issue restaurant); *Felder v. Physiotherapy Assocs.*, 215 Ariz. 154, 163, ¶¶ 41–43 (App. 2007) (holding that fact of damages was proved because personal-injury plaintiff had an active career in professional baseball, albeit as a minor-leaguer).[3] The chief consideration appears to be probable market success, as shown by general market conditions or by evidence of realistic third-party commitments. *See Great W. Bank v. LJC Dev., LLC,* 238 Ariz. 470, 474, 479, 481–82, ¶¶ 7, 30, 41–42 (App. 2015) (holding evidence sufficient where market reports showed that construction borrower would have completed a profitable development had lender not wrongfully terminated financing); *County of La Paz v. Yakima Compost Co.*, 224 Ariz. 590, 607–08, ¶ 54 (App. 2010) (holding evidence sufficient where customer had previously made and performed on oral commitment, and reached terms with plaintiff's successor and a similar company); *Weiner v. Ash*, 157 Ariz. 232, 235 (App. 1988) (holding evidence insufficient where general data showed a lucrative market, and plaintiffs showed financial wherewithal to continue participation in the market, but no evidence showed they would have made the same profitable deals as others); *Rancho Pescado*, 140 Ariz. at 185–86 (holding evidence insufficient where plaintiff proposed entering inherently risky industry with an underdeveloped execution plan and inadequate marketability evidence); *U.S. Fid. & Guar. Co. v. Davis*, 3 Ariz. App. 259, 260–62 (1966) (holding evidence sufficient where buyer had made oral commitment).

**¶19**　　　　Many litigants hire experts to assist in demonstrating a venture's lost profits. McAlister and MT offered Ron Epperson for this

---

[3]　　　　Though McAlister and MT cite *Felder*'s discussion of the evidence regarding the plaintiff's major-league prospects, *Felder* made clear that this evidence pertained not to the fact of the plaintiff's damages but to their amount. *See* 215 Ariz. at 163–65, ¶¶ 44–51. McAlister and MT have also moved us to take judicial notice of certain baseball statistics in connection with its reliance on *Felder*. We deny that motion.

purpose. In each of Epperson's expert reports, he relied on differing payment arrangements and arrived at differing damages amounts. In the 2014 preliminary report, Epperson opined that Loeb & Loeb's alleged misconduct caused approximately $8 million in damages because of a lost profit- and royalty-sharing opportunity with Donal O'Flynn. In the 2019 report, Epperson opined that the plaintiffs had incurred approximately $125 million in damages because of lost licensing deals with O'Flynn and three other potential investors: Chris Haver, Bernie Karl, and Peter Burns. In the 2021 report, Epperson estimated the lost profits on the licensing deals to be approximately $101 million.

¶20            Epperson based his estimates on conversations with and declarations from the various investors, as well as on their deposition testimony. He also relied on information provided by McAlister, including unsigned license agreements that referred only generally to MT intellectual property as their subject. Each agreement described a minimum-royalty fee to be paid annually, with the agreements for O'Flynn, Karl, and Burns defining the fee as $20 million and the agreement for Haver containing blank lines. But O'Flynn, Karl, and Burns each testified that they did not anticipate paying any royalty fees for years, until operations were underway and commercialization was achieved, and Burns testified that he had no knowledge as to when he would incur a responsibility to pay.

¶21            Epperson acknowledged that each proposed deal was in the early stages of negotiation and did not include a business plan or market analysis explaining how commercialization leading to the claimed lost profits would be achieved. Epperson acknowledged "[t]he McAlister technology has never been practiced at the scale envisioned in the license agreement (a $400 M plus per year revenue business)," and that "[t]he capital cost of production facilities using new technology are unknown, and it is unknown if [the potential investors] have the ability to fund those capital costs."

¶22            Epperson testified that he did not consider the marketplace in terms of competitors or a specific client base. He stated that though he knew McAlister had been trying to commercialize his technologies for decades, he did not know whether the technologies worked or could be commercialized. He acknowledged, "[i]t's possible that [potential investors and McAlister] would have not reached an agreement on terms or they might have reached an agreement on different terms," explaining that "we're in a land that we just don't know."

¶23 To account for this uncertainty, Epperson assumed near-immediate minimum royalty payments by the potential investors but applied discount rates of 60–75%. He explained, without citing any authority, that "[w]hen analyzing a new venture, it is typical practice to apply a discount rate to the cash flows" to "account[] for both the time value of money . . . as well as risk factors such as technology, markets, execution risk, etc.," and "a business venture that is in the very early stages may be assigned a discount factor from 40–80%."[4] He opined that venture or angel investors often use high discount rates to account for the fact that many deals fail.

¶24 Loeb & Loeb moved to exclude Epperson's testimony and opinions, arguing that they "lack a reliable methodology, rely on demonstrably and [sic] inaccurate assumptions, and are speculative." Loeb & Loeb also moved for summary judgment on damages, reiterating its attack on Epperson's methodology and arguing that there was insufficient evidence that the potential investors could or would have made the deals.

¶25 The superior court granted both motions, describing Epperson's lost-profits model as "wildly speculative, irrelevant and misleading." The court found it "speculative that both the parties would have ultimately reached terms and that any of these entities would be profitable," and therefore concluded that "[t]he gap in this case . . . between 'planning' to license technology and a profitable business, is simply too wide to span without wild speculation" and "[p]rojecting profits in such circumstances 'involve[s] more the talents of a conjurer than those of [an economist].'"

¶26 In reaching its decision, the court emphasized the "enormous, recognized risks" of the proposed deals; the court noted that McAlister had no history of successful commercialization or profitability, there were no signed contracts, no meaningful financial projections, no market analysis, no business plans, no technology proven beyond the laboratory, no management team, and no production capability. The court observed that Epperson did not consider the nature of any marketplace, the product that would be produced, or the amount or allocation of expenses. The court also found that Epperson's use of high discount rates did not "save the day"

---

4 The plaintiffs later provided a finance-journal article stating that venture capitalists typically use discount rates of 30–70%.

because that approach "guarantees lost profits to any new business that can establish *any revenue*."

¶27　　　　Deeming Epperson's opinions' deficiencies too pervasive to be curable by cross-examination, the court excluded them under Arizona Rule of Evidence (Rule) 702. The court alternately excluded the opinions under Rule 403 as unduly prejudicial and potentially misleading, and went on to grant summary judgment on lost-profits damages.

### A. Exclusion Pursuant to Rule 702

¶28　　　　Arizona's Rule 702 is based on its federal counterpart and the principles espoused by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); Ariz. R. Evid. 702 cmt. (2012); *State ex rel. Montgomery v. Miller*, 234 Ariz. 289, 297 (App. 2014). We may therefore look to the federal rule and federal caselaw for guidance. *State v. Bernstein*, 237 Ariz. 226, 228, ¶ 9 (2015). The rule "recognizes that trial courts should serve as gatekeepers in assuring that proposed expert testimony is reliable and thus helpful to the jury's determination of facts at issue," though the "gatekeeping function is not intended to replace the adversary system" or "to supplant traditional jury determinations of credibility and the weight to be afforded otherwise admissible testimony." Ariz. R. Evid. 702 cmt. (2012). Where expert testimony is "shaky" but admissible, its deficiencies should be addressed not by exclusion but by cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. *Id.*; *Bernstein*, 237 Ariz. at 229, ¶ 22. The burden of proof is on the testimony's proponent, by a preponderance of the evidence. *State v. Salazar-Mercado*, 234 Ariz. 590, 593–94, ¶ 13 (2014).[5]

¶29　　　　Assuming an expert is qualified, a court's first inquiry under Rule 702 is relevancy and reliability. *Daubert*, 509 U.S. at 597. The testimony must relate to an issue in the case and constitute more than unsupported speculation. *Miller*, 234 Ariz. at 298, ¶ 21; *Daubert*, 509 U.S. at 591, 597. Testimony offered "to plug evidentiary holes . . ., to speculate, and to

---

[5]　　　　A revised version of Rule 702 took effect in January 2024. *See* 2023 Arizona Court Order 0023. The revised rule states that the proponent of expert testimony must establish the rule's requirements by a standard of "more likely than not," and changes the "has reliably applied" requirement to "reflects a reliable application." *Id.* A comment to the amendment explains that the changes reflect those made to the federal rule in 2023 and are intended to clarify the standard of proof and confirm that "cold" experts are permissible. *Id*. cmt. (2024).

surmise" should be excluded because such cannot be helpful to the factfinder. *In re Aluminum Phosphide Antitrust Litig.*, 893 F.Supp. 1497, 1506–07 (D. Kan. 1995).

¶30        The court must then decide "whether the expert obtained enough information or data to make the proffered opinion reliable." *Miller*, 234 Ariz. at 298, ¶ 22. This inquiry is purely quantitative, and an expert's use of inadmissible, hypothetical, or disputed facts does not require his exclusion. *Id.*; *see also* Fed. R. Evid. 702, advisory committee's note to 2000 amendment. The expert may make projections, *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025 (9th Cir. 2022), and in doing so may rely on "hypothetical facts that are supported by the evidence," Fed. R. Evid. 702, advisory committee's note to 2000 amendment. But his testimony may not be "wholly speculative or unfounded." *Elosu*, 26 F.4th at 1025. He may not rely on assumptions that are unrealistic or plainly contradicted by the facts. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21–22 (2d Cir. 1996); *see also Boyar v. Korean Air Lines Co.*, 954 F.Supp. 4, 8–9 (D.D.C. 1996); *In re Aluminum Phosphide Antitrust Litig.*, 893 F.Supp. at 1507. Nor may he arbitrarily cherry-pick the facts. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987).

¶31        The court must then determine if the expert was able "to explain how his methods, reasoning and opinions are based on 'an accepted body of learning or experience,'" and whether he applied the methods reliably. *Miller*, 234 Ariz. at 298–99, ¶¶ 23–26. Scientific certainty is not required for this fact-specific inquiry, which may involve consideration of factors such as whether the methods employed are generally accepted, whether they have been tested and peer-reviewed, and the known or potential error rate. *Id.* at ¶¶ 23–24. And admission is favored in close cases. *Bernstein*, 237 Ariz. at 229-30, ¶¶ 17–18. But the "court may conclude that there is simply too great an analytical gap between the data and the opinion offered." *Miller*, 234 Ariz. at 299, ¶ 26 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Where, for example, a lost-profits expert must rely on "a multitude of assumptions . . . to establish projections of profitability over the life of [a] contract" and those assumptions "require speculation and conjecture," it may be "beyond the capability of even the most sophisticated procedures to satisfy the legal requirements of proof with reasonable certainty." *Kenford Co. v. Erie Cnty.*, 493 N.E.2d 234, 236 (N.Y. App. 1986). The court should exclude testimony "that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

¶32        Based on the foregoing, the superior court acted within its discretion by excluding Epperson's opinions as speculative and unreliable

under Rule 702. To reach his opinions, Epperson speculated about critical facts (particularly regarding the minimum-royalty payments), inexplicably ignored expenses, and without adequate explanation used an algorithm that assumed profitability based on (speculative) revenue alone. There was "simply too great an analytical gap between the data and the opinion proffered"—the only connection was Epperson's *ipse dixit*. *See Joiner*, 522 U.S. at 146; *see also Miller*, 234 Ariz. at 299, ¶ 26. The superior court correctly acted as the gatekeeper in precluding this expert's opinion.

## B. Exclusion Pursuant to Rule 403

**¶33** The superior court also properly excluded Epperson's opinion under Rule 403. Rule 403 permits the court to exclude otherwise-admissible evidence if its probative value is substantially outweighed by the danger of unfair prejudice or misleading the jury. *Salazar-Mercado*, 234 Ariz. at 594, ¶ 13. The court has considerable discretion here. *State v. Cooperman*, 232 Ariz. 347, 351, ¶ 17 (2013). In view of the multiple deficiencies in Epperson's opinions and the power of an expert's imprimatur, even if the opinions could be characterized as "shaky but admissible" under Rule 702, the court acted well within its discretion by excluding them under Rule 403.

## III. Entry of Summary Judgment on Damages

**¶34** We next address the plaintiffs' argument that the damages evidence forestalled summary judgment even given the exclusion of Epperson's analysis. We review the grant of summary judgment de novo, viewing the facts in the light most favorable to the non-moving party. *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 12 (2003). Summary judgment should be granted "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). Summary judgment is warranted "if the facts produced in support of the claim . . . have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim." *Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990). The mere existence of a "scintilla" of evidence that creates the "slightest doubt" is insufficient to withstand a motion for summary judgment. *Id.*

**¶35** In the context of Epperson's opinions, the evidence was inadequate to permit a non-speculative finding of lost profits with respect to royalty payments. Like Epperson, a factfinder would have to engage in speculation to conclude that the plaintiffs would have received those

payments. The factfinder would have to speculate either that the potential investors would have reversed their unwillingness to make immediate royalty payments, or that the unknown technologies would have been successfully commercialized despite the plaintiffs' history and the numerous, enormous uncertainties and risks. With respect to the royalties, this was a case where a "multitude of assumptions . . . requir[ing] speculation and conjecture" placed a reasonably certain determination of lost profitability "beyond the capability of even the most sophisticated procedures." *See Kenford*, 493 N.E.2d at 236. There was simply too large a gap to create a factual question precluding summary judgment regarding most of the plaintiffs' claimed lost profits.

¶36 But the potential initial payment from O'Flynn raises a different issue. O'Flynn indicated in his 2020 deposition that he "was fine" with paying "5 million upfront" to the plaintiffs—with no specified contingencies. To be sure, this testimony's credibility is called into doubt by the fact that O'Flynn did not consistently affirm this commitment in his multiple declarations over the course of this litigation.[6] But summary judgment cannot be granted based on credibility determinations. *Orme Sch.*, 166 Ariz. at 309. "[S]ummary judgment should not be used as a substitute for jury trials simply because the trial judge may believe the moving party *will* probably win the jury's verdict, nor even when the trial judge believes the moving party *should* win the jury's verdict." *Id.* at 310. Though O'Flynn's testimony provides sparce grounds for a finding of lost profits, we cannot say that it was insufficient to forestall summary judgment.

¶37 Based on the foregoing, we must conclude that though the superior court's entry of summary judgment on damages was largely proper, the plaintiffs were entitled to have the factfinder assess whether there is credible evidence that O'Flynn would have made an initial payment of $5 million with no specified contingencies.

## IV.    Entry of Summary Judgment on Trespass to Chattel

¶38 We next address the plaintiffs' argument that the superior court erroneously entered summary judgment on the trespass to chattel claim. The plaintiffs assert that Loeb & Loeb deprived them of using their intellectual property rights by re-titling the patent applications. The

---

[6] We note that though a party cannot defeat summary judgment by submitting a sham affidavit contradicting his previous sworn testimony, *Perdue v. La Rue*, 250 Ariz. 34, 39–40, ¶ 17 (App. 2020), those are not the facts here.

superior court held because there was no evidence of physical interference—actual physical contact with chattel—the claim was physically impossible. We hold that was error.

¶39 Arizona law defines trespass to chattel consistent with the Restatement (Second) of Torts ("Restatement") § 217 (1965): "intentionally dispossessing another of the chattel or using or intermeddling with a chattel in the possession of another." *Koepnick v. Sears Roebuck & Co.*, 158 Ariz. 322, 330–31 (App. 1988). Dispossession occurs when chattel is taken from another's physical control, Restatement § 221, and intermeddling occurs when physical contact is brought about with chattel in another's possession, Restatement § 217 cmt. e.

¶40 First, we hold that trespass to chattel may be based on interference with patent applications. In conversion cases, which differ from trespass to chattel cases mainly in degree, *see* Restatement § 222A cmt. a, we have expressly held that claims may involve "intangible property that is merged in, or identified with, some document," such as "a stock certificate or an insurance policy," *Miller v. Hehlen*, 209 Ariz. 462, 472, ¶ 35 (App. 2005). The Restatement explains that liability exists "[w]here there is conversion of a document in which intangible rights are merged," or where "[o]ne . . . effectively prevents the exercise of intangible rights of the kind customarily merged in a document . . ., even though the document is not itself converted." Restatement § 242. Intangible rights are "merged" in a document "when by the appropriate rule of law, the right to the immediate possession of a chattel and the power to acquire such possession is represented by a document." Restatement § 242 cmt. a. Properly filed patent applications represent, at minimum, future contingent ownership rights "to exclude all others from making, using, or selling the protected invention[s]." *Paradigm Alliance, Inc. v. Celeritas Techs., LLC*, 659 F.Supp. 2d 1167, 1189 (D. Kan. 2009). Their fraudulent assignment therefore can support a conversion claim, *Harris v. Coleman*, 863 F.Supp. 2d 336, 344–45 (S.D.N.Y. 2012), and, logically, the lesser claim of trespass to chattel.

¶41 We hold that in the modern digitized world, electronic touching may suffice. Consistent with that view, courts have recognized trespass to chattel claims where a party contacts another's computer network via spam emails or search-robot software. *See Register.Com, Inc. v. Verio, Inc.*, 356 F.3d 393, 438 (2d Cir. 2004) (search-robot software); *America Online, Inc. v. Nat'l Health Care Discount, Inc.*, 121 F.Supp.2d 1255, 1259 (N.D. Iowa 2000) (spam emails); *see also* Dan B. Dobbs et al., *The Law of Torts* ("Dobbs"), at § 60 (2000) (recognizing tort's extension to bulk emails and hacking). To the extent that our decision in *Mobilisa, Inc. v. Doe* suggests that

remote contact is insufficient, we reject that suggestion. *See* 217 Ariz. 103, 106–07, 113–14, ¶¶ 3–4, 34–39 (App. 2007) (denying summary judgment on trespass to chattel and other claims based on unauthorized access of an email, emphasizing that absence of hacking evidence supported inference that defendant used plaintiff's physical computers).

**¶42** We conclude that the superior court erred by entering summary judgment on the trespass to chattel claim based on the evidence and the tort's elements. But our inquiry does not end here. Loeb & Loeb made secondary summary-judgment arguments that the court did not address. We examine those arguments because we may affirm a grant of summary judgment based on arguments raised but not expressly considered below. *See Zuck v. State*, 159 Ariz. 37, 42 (App. 1988).

**¶43** First, Loeb & Loeb argued that it could not be liable because it only acted as AGT's agent. But Loeb & Loeb provided no legal authority in support of this argument—and we note that "[i]t is well-established law that an agent will not be excused from responsibility for tortious conduct because he is acting for his principal." *Griffith v. Falz*, 162 Ariz. 599, 600–01 (App. 1990). We therefore will not affirm the entry of summary judgment on agency grounds.

**¶44** Loeb & Loeb next argued that liability for trespass to chattel is measured in terms of fair market value, and that the plaintiffs presented no evidence of the same. We need not address whether the plaintiffs presented evidence of a loss or diminution in the intellectual property's fair market value because they waived all damage claims except for lost profits. We hold that lost profits may be recoverable for trespass to chattel. Though damages for loss of use of a chattel traditionally are measured by reference to the chattel's market value (as we have recognized, *see State v. Pearce*, 156 Ariz. 287, 289 (App. 1988)), under the modern view, damages may be measured by lost profits if the plaintiff needed the chattel to conduct his business. *E.g.,* Dobbs at §§ 60 (describing modern view applicable where trespass to chattel involves dispossession or physical harm), 73 (describing recovery in conversion cases). Accordingly, in view of O'Flynn's testimony regarding an initial payment, sufficient evidence precluded entry of summary judgment on the trespass to chattel claim on damages grounds. We thus reverse the entry of summary judgment on the trespass to chattel claim.

## V. Entry of Summary Judgment on Slander of Title

¶45 Finally, we address the plaintiffs' argument that the superior court erroneously entered summary judgment on the slander of title claim by applying the one-year limitations period of A.R.S. § 12-541(1) "for injuries done to the character or reputation of another by libel or slander" rather than the two-year limitations period of A.R.S. § 12-542(3) for actions "[f]or trespass for injury done to the estate or the property of another."

¶46 Slander of title occurs when there is a "publication of a false statement disparaging another's property rights in land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary harm to the other through the conduct of third persons in respect to the other's interests in the property." Restatement § 624. A statement is disparaging "if it is understood to cast doubt upon the . . . existence or extent of [one's] property in" his chattels. Restatement § 629. The false and disparaging statement must be made with malice, which "means acting 'from improper motives or without reasonable belief in the efficacy of the claim.'" *SWC Baseline & Crismon Invs., L.L.C. v. Augusta Ranch Ltd. P'ship*, 228 Ariz. 271, 287, ¶ 63 (App. 2011) (citation omitted). Damages may be recovered for "pecuniary loss," Restatement § 623A, which may include lost profits, Restatement § 633 cmt. h, illustration 1.

¶47 Loeb & Loeb relies on *Gee v. Pima County*, in which this court declined to resolve the parties' dispute regarding whether A.R.S. § 12-541(1) or A.R.S. § 12-542(3) applied to slander of title but stated that "[t]he majority of the courts that have considered the issue have held that the statute of limitations for libel governs actions for slander of title," and "we do not see any reason to vary the statute of limitations because property rather than a person is defamed." 126 Ariz. 116, 116 (App. 1980). Loeb & Loeb's reliance on *Gee* is misplaced. First, *Gee*'s discussion of the applicable limitations period is non-binding dicta. *See Canas v. Bay Entertain., LLC*, 252 Ariz. 117, 120, ¶ 15 (App. 2021) (holding that statements not necessary to a case's decision are not binding precedent, and at most may have persuasive value). Second, in considering that discussion, we note few courts have decided the issue, the relevant statutes are not uniform between jurisdictions, and there is no "overwhelming majority and no clear trend." *See* 1A American Law of Torts § 5:40 (2023); 131 A.L.R. 837 (2023). We examine the issue independently.

¶48 Limitations defenses are disfavored, and the longer of two limitations periods should be used where there is substantial doubt as to which applies. *Drug, Cosmetic & Beauty Trade Servs., Inc. v. McFate*, 14 Ariz.

App. 7, 9 (1971). Slander of title "is not a true defamation action, being historically an action on the case for special damages arising from a falsehood." *Stewart v. Fahey*, 14 Ariz. App. 149, 150 (1971); *see also* Dobbs at § 656 ("Trade libel is not libel and slander of title is not slander."). Slander of title is of fundamentally different character than defamation—defamation harms a person's reputation, whereas slander of title harms a property interest. *See, e.g.*, Restatement §§ 559, 623A, 624. Based on this difference and the general policy disfavoring limitations defenses, we hold that the court erred by applying the one-year limitations period "for injuries done to the character or reputation of another by libel or slander." *See* A.R.S. § 12-541(1). We need not resolve whether the three-year period "[f]or trespass for injury done to the estate or the property of another" prescribed by A.R.S. § 12-542(3) was the correct fit, because in any event the claim was timely under the four-year catch-all period established by A.R.S. § 12-550.

**¶49**      We conclude that the entry of summary judgment on limitations grounds was error. But again, our inquiry does not stop there because Loeb & Loeb raised additional arguments below that the superior court did not expressly address. *See Zuck*, 159 Ariz. at 42.

**¶50**      First, Loeb & Loeb argued that the plaintiffs could not show, as necessary elements of slander of title, that statements asserting AGT's ownership of the intellectual property were false and malicious. But the ownership issue was hotly debated, and the plaintiffs put forth evidence—including an email in which a Loeb & Loeb attorney described AGT as a "licensee" to a patent examiner, and provisions of the "License Agreement" stating that AGT "will own all Proprietary Rights in any patentably distinct Inventions and/or Improvements" except "McAlisterTech will retain all ownership in all Patent Rights"—to support their position AGT licensed rather than owned the intellectual property. In view of that evidence, we will not affirm the entry of summary judgment based on insufficient proof of falsity or malice.

**¶51**      Next, Loeb & Loeb argued that the plaintiffs had not pled, disclosed, or otherwise identified special damages. As opposed to general damages, which "are such as the law implies and presumes to have occurred from the wrong complained of," special damages are "those which are the natural but not the necessary consequence of the act complained of and usually stem from the particular circumstances of the case." *S. Ariz. Sch. for Boys, Inc. v. Chery*, 119 Ariz. 277, 280 (App. 1978). Slander of title requires proof of special damages, *SWC Baseline & Crismon Invs.*, 228 Ariz. at 287, ¶ 63, which "must be specifically stated," Ariz. R. Civ. P. 9(g). The plaintiffs argue that their claimed lost-profits damages

were excepted from the specific-pleading requirement under *Drew v. United Producers & Consumers Coop.*, 161 Ariz. 331, 333–34 (1989), which held that "[e]ven in tort cases in those jurisdictions requiring special allegations before lost profits may be recovered, lost profits that are the 'natural, necessary and logical' result of the defendant's actions, need not be specifically pleaded."

**¶52** But even assuming that a specific allegation was required, that standard is met "when [a pleading] notifies the defendant of the nature of the claimed damages even though it does not delineate them with 'as great precision as might be possible or desirable,'" *S. Ariz. Sch. for Boys*, 119 Ariz. at 281 (citation omitted). That is the case here, where the plaintiffs alleged in their complaint that "[b]ecause this cloud [on title to MT's intellectual property] prevented MT from raising investment funds off these patents, proprietary rights in a significant portion of these patents have been irretrievably lost." We will not affirm the entry of summary judgment based on the damages pleading standard. We reverse the entry of summary judgment on the slander of title claim as unwarranted on any grounds raised.

## CONCLUSION

**¶53** We affirm in part and reverse in part. We affirm the exclusion of the plaintiffs' damages expert as unreliable. We largely affirm the entry of summary judgment on damages, except we reverse and remand regarding summary judgment related only to damages for a potential lost initial payment from O'Flynn. We reverse and remand on the entry of summary judgment on the trespass to chattel and slander of title claims, subject to the limitation on alleged damages.



AMY M. WOOD • Clerk of the Court
FILED:   AA

17