NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

ARMANDO PADILLA, JR., *Appellant.*

No. 1 CA-CR 24-0071

FILED 12-12-2024

Appeal from the Superior Court in Maricopa County
No. CR2022-030714-001
The Honorable Laura J. Giaquinto, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eliza C. Ybarra
*Counsel for Appellee*

Law Offices of Kamille Dean, P.C., Phoenix
By Kamille R. Dean
*Counsel for Appellant*

———————————————

**MEMORANDUM DECISION**

Judge Daniel J. Kiley delivered the decision of the Court, in which Presiding Judge Michael J. Brown and Judge D. Steven Williams joined.

———————————————

**K I L E Y**, Judge:

**¶1**          Armando Padilla, Jr. ("Padilla") appeals his convictions for aggravated driving under the influence ("DUI"), arguing that the superior court erred in overruling certain evidentiary objections and in denying his motion for judgment of acquittal under Arizona Rule of Criminal Procedure ("Rule") 20. We affirm.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2**          Viewed in the light most favorable to sustaining the verdict, *see State v. Thompson*, 252 Ariz. 279, 287, ¶ 2 n. 3 (2022), the evidence shows that in May 2021, Padilla and his wife, Melissa Padilla ("Melissa")[1], who lived in Mesa, had been arguing for several days when, on the evening of May 20, Melissa packed up some of Padilla's clothes, put them in their white Chevrolet Suburban, and told him to leave. Padilla departed in the Suburban. Because of a past DUI conviction, Padilla was prohibited from driving a motor vehicle that was not equipped with an ignition interlock device ("IID"). *See* A.R.S. § 28-3319. The Suburban was not equipped with an IID.

**¶3**          The next morning, Melissa left home "a little after 8:00" to go to work. While stopped at a red light, Melissa looked behind her and saw Padilla driving the Suburban. A few minutes later, Melissa received "an alert" on her phone's location-tracking app indicating that Padilla was at their house. Melissa turned around and drove back home.

**¶4**          Padilla's next-door neighbor R.L. later testified that he was standing in front of his house at around 8:15 a.m. when he saw Padilla "in his Suburban driving up and down the street very slowly, back and forth." R.L. then went back inside his house.

---

[1] To avoid confusion, we respectfully refer to Padilla's family members by their first names.

¶5　　　　As Melissa pulled up to her house, she "saw [Padilla] pull into the driveway . . . and get out" of the Suburban. As she later stated, she "could see he was drunk." Melissa got out of her car and called out to Padilla, telling him to leave. When Padilla walked around to the back of the house, Melissa got back in her car and called 911. The 911 call was placed at 8:38 a.m.

¶6　　　　Melissa told the 911 dispatcher that Padilla was "drunk" and "trying to get into [their] home." When the 911 dispatcher asked, "What kind of vehicle did he show up in?", Melissa responded, "In a white Chevy Suburban. It's parked in the driveway right now."

¶7　　　　While Melissa was on the phone, Padilla approached her car and banged on the window. Startled, Melissa screamed and told the dispatcher that Padilla was "hitting [her] vehicle" and "trying to break the windows." Padilla then walked away.

¶8　　　　At about "8:30" or "8:35" a.m., "roughly 10 [or] 15 minutes" after he had seen Padilla driving the Suburban, R.L. heard a knock at his front door. He opened the door to find Padilla "[s]taggering," "mumbling," and asking "if [R.L.] could hide him because the police were coming." When R.L. refused, Padilla left.

¶9　　　　Shortly thereafter, R.L. approached Melissa's car while she was still on the phone with the 911 dispatcher. The following exchange was captured on the recording of the 911 call:

> R.L.: He wants me to hide him. But I don't -- What's going on? I don't want to get involved. Is there something I can do or --
>
> Melissa: No, the police are on the way. He's drunk.
>
> R.L.: I know, I seen that. I saw him driving by here like ten times.

¶10　　　　Melissa remained on the phone with the 911 dispatcher until police officers arrived at the scene between 8:48 and 8:53 a.m. When officers arrived, the Suburban was parked in the driveway, Melissa was still sitting in her car parked in the street, and Padilla was sitting on a brick wall in front of the home. The officers observed "obvious signs" of Padilla's impairment, *e.g.*, a "lack" of "stability" and "slurred speech." Officer DeMarco approached Padilla and stated, "You're drunk." Padilla nodded and replied, "Yep."

3

¶11　　　　Officer Pellegrino then asked Padilla, "How much alcohol have you had to drink?" Padilla replied, "A lot." Pellegrino asked him to quantify his alcohol consumption, but Padilla replied that he was unable to. Pellegrino then asked, "Are we talking, like, ten drinks?" Padilla answered, "Yeah, ten drinks." Pellegrino asked what Padilla drank, and he answered, "Vodka." Pellegrino asked, "Was it a shot?" to which Padilla answered, "Yeah, it was a shot." Pellegrino asked, "What do you think, like, what is that, like, four ounces?" to which Padilla nodded his head and answered, "Yeah." Pellegrino then asked, "What was the time of your last drink?" Padilla answered, "An hour."

¶12　　　　Officer DeMarco conducted a pat down of Padilla and found car keys in his pocket. Padilla said the keys were to the Suburban, but denied that he had driven it, or any other vehicle, that morning. When asked how he got to the house that day, Padilla claimed that his sister Alyssa Padilla ("Alyssa") had dropped him off. When Padilla urged DeMarco to call Alyssa to verify his claim, the officer stepped away to call her. Moments later, DeMarco returned. The following exchange was captured on the recording from DeMarco's body worn camera ("BWC"):

> Padilla: She don't want to talk to me?
>
> DeMarco: Who?
>
> Padilla: My mom.
>
> DeMarco: No, I was talking to Alyssa.
>
> Padilla: Oh, were you?
>
> DeMarco: Yeah, you know what she told me.
>
> Padilla: Yeah.
>
> DeMarco: Why do you want to lie to me? Come on, brother.

At that point, Padilla turned around and raised his hands over his head. When DeMarco told him that he was "not under arrest yet," Padilla replied, "Yeah . . . might as well."

¶13　　　　Officer Kuntz administered a horizontal gaze nystagmus test ("HGN") at 9:43 a.m., "observed all six clues of nystagmus" which, he later testified, indicates alcohol impairment.

¶14         Padilla was arrested and, after being read his *Miranda rights*[2], consented to a blood draw. The blood sample was taken at 10:43 a.m. and was examined by forensic scientist Alicia Miller ("Miller"), who determined that the alcohol level in the blood sample was .267.

¶15         The State charged Padilla with two class 4 felonies: aggravated driving while impaired to the slightest degree in violation of A.R.S. §§ 28-1381(A)(1) and -1383(A)(4) (the "A(1) charge") and aggravated driving with a BAC of .08% or more within two hours of driving in violation of A.R.S. §§ 28-1381(A)(2) and -1383(A)(4) (the "A(2) charge").

¶16         At trial, R.L. testified about his observations of Padilla driving that morning and their conversation when Padilla knocked on his front door. He also testified that at no point that morning did he see Padilla in possession of any bottle, can, or other container that appeared to be an alcoholic beverage.

¶17         Officer Kuntz testified about the HGN test that he conducted. He also testified, based on his training and experience, about driving cues that indicate impairment, noting that one such cue is driving "under the speed limit."

¶18         Officer Pellegrino testified that when he was called to the scene that day, he spoke with Padilla, noting that Padilla's eyes were "bloodshot," his speech was "very slurred," and he had "a hard time . . . standing up straight." Pellegrino added that Padilla "just kept asking me, 'take me to jail.'" Pellegrino testified that, in response to his questions, Padilla reported having "ten drinks" that morning, elaborating that he consumed ten "four-ounce shots" of vodka and drank the last one at "8:30 in the morning." He further testified, however, that when he again asked Padilla about his alcohol consumption after the blood draw, Padilla claimed to have had only "two" drinks.

¶19         Finally, Pellegrino testified that he had contact with Padilla over a period of at least two hours that morning, and that the signs of impairment that Padilla exhibited "stayed relatively the same."

¶20         The State also called Officer DeMarco, who testified about his observations and conversation with Padilla at the scene. When asked about Padilla's claim at the scene to have consumed ten shots of vodka, DeMarco

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

testified that he did not observe any bottles, cans, or other alcoholic beverage containers in Padilla's possession or on the ground.

¶21        After counsel completed their examination of the witness, the court invited jurors to submit proposed written questions. *See* Ariz. R. Crim. P. 18.6(e). A juror submitted a question reading, "Is a witness seeing someone drive while intoxicated enough probable cause for an arrest?" Padilla objected to the question being put to the witness, arguing, *inter alia*, that the question called for a legal conclusion and risked confusing the jury. The court overruled the objection and read the question to the witness. DeMarco answered, "Yes, it will." Padilla declined to conduct any follow-up examination.

¶22        Miller testified that she performed a retrograde[3] extrapolation of the BAC detected in Padilla's blood sample, accounting for Padilla's gender and weight, and determined that, as of 10:14 a.m., Padilla's BAC would have been in the range of .271-.281. When asked by defense counsel if it was "possible for a person to drink enough vodka" within fifteen or twenty minutes "to have a blood alcohol concentration of .267 two hours later," Miller acknowledged that it was "technically possible," but "highly unlikely." She explained that a person who drank "that amount of alcohol in that limited time frame" would "likely . . . either throw up or . . . have alcohol poisoning."

¶23        The State concluded its case-in-chief by presenting testimony and documentary evidence establishing that the IID restriction on Padilla's driver's license was in effect on May 21.

¶24        After the State rested, Padilla moved for judgment of acquittal under Rule 20 on both counts. *See* Ariz. R. Crim. P. 20(a)(1). The court denied Padilla's request, finding "substantial evidence to support the allegations" on both counts.

¶25        Padilla called his own expert witness, Michael Grommes ("Grommes"), a forensic toxicologist. Grommes testified that a man weighing 200 lbs. who consumed 22.6 ounces of vodka in the span of fifteen to twenty minutes would have a BAC of .267 two hours later, while a man who weighed 220 lbs. who consumed 25 ounces of vodka in the same

---

[3] "A retrograde, or retroactive extrapolation, is a method by which a person's BAC at an earlier point in time is calculated based on his BAC from a later blood test." *State ex rel. Montgomery v. Miller*, 234 Ariz. 289, 295, ¶ 5 (App. 2014).

amount of time would reach the same BAC two hours later.[4] When asked if a person who consumed alcohol in this manner would exhibit "a rapid change in their behavior," Grommes answered "Yeah," explaining that "if somebody goes from no alcohol to an alcohol level that high, I would expect to see changes in their balance" and "speech."

¶26        Grommes further testified that "impairment is not the same thing as somebody being drunk." Instead, he stated, being impaired simply means that one's ability "to perform [a] task is diminished." He explained, for example, that a person with a BAC of .267 may still be able to drive a car without committing any traffic violations.

¶27        Grommes explained that alcohol impairment occurs along a "continuum." "[T]he first thing" that alcohol affects, he stated, "is somebody's cognitive ability and their sensory skills." After that, alcohol affects a person's "fine motor skills," and then "gross motor skills." It "doesn't matter who you are," he explained, "that's the order at which you're impaired." "[I]f your gross motor skills are impaired," he elaborated, then "your fine motor skills . . . vision . . . [and] cognitive function" are also necessarily impaired. Indications of gross motor skills impairment, Grommes explained, include "somebody [having] trouble standing, walking, [or] us[ing] a wall for balance." When asked if slurred speech indicated impairment of fine motor skills or gross motor skills, Grommes responded that slurred speech "would be kind of in between."

¶28        Padilla then called his wife Melissa as a witness. She testified that she did not see Padilla drink anything or drive any vehicle on May 21. When asked why she made statements to the contrary to law enforcement that day, Melissa stated that she made a false report because she and Padilla "were arguing so much during that time" that she thought they might be headed for divorce. Believing that "there would be a fight about . . . the house if [they] did divorce," she explained, she decided to falsely accuse Padilla of DUI in the hope that, "if [she] got him in trouble" and "he went away," she "would get the home."

¶29        Padilla testified in his own defense. He stated that he left the home at his wife's behest on May 20 and spent the night at his sister Alyssa's house. The next morning, he stated, he returned home because he did not have the clothes he needed for work that day. Padilla testified that

---

[4] Padilla later testified that his weight "fluctuates" between 200 and 220 lbs.

his brother and his brother's girlfriend picked him up at Alyssa's house and drove him home and dropped him off "a little after 8:00."

¶30 Padilla stated that, upon realizing he couldn't get into the locked house, he retrieved a bottle from his "stash of alcohol" in a "hiding place[]" at "the side of the house near the backyard." He then "downed a complete fifth of vodka . . . [in] a matter of minutes." As a result, he stated, he became "intoxicated," and was in that state when the police arrived.

¶31 Padilla denied R.L.'s testimony that he had been driving the Suburban that morning, suggesting that R.L. was deliberately untruthful because the two had "many arguments" during the time they were neighbors. When asked if he had the keys to the Suburban in his pocket that morning, Padilla answered, "No." When asked why he told Officer DeMarco that the keys in his pocket belonged to the Suburban, Padilla replied, "I don't remember what I said," adding, "When I made that statement, I was intoxicated."

¶32 The jury convicted Padilla on both counts. He was sentenced to concurrent, presumptive terms of 4.5 years' imprisonment.

¶33 Padilla timely appealed. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1), 13-4031, -4033(A)(1).

## DISCUSSION

¶34 Padilla argues that the superior court abused its discretion by (1) admitting Officer DeMarco's BWC recording, (2) overruling his objection to a question submitted by a juror, and (3) denying his Rule 20 motion for acquittal on both counts of aggravated DUI.

¶35 We review the superior court's evidentiary rulings for an abuse of discretion. *State v. Payne*, 233 Ariz. 484, 502, ¶ 49 (2013).

### A. Hearsay Statement

¶36 Padilla argues that the court abused its discretion by allowing the State to present Officer DeMarco's BWC recording as an exhibit because, he contends, the recording contained hearsay.

¶37 After telling DeMarco that Alyssa drove him home that morning, Padilla urged DeMarco to call her to confirm his claim. DeMarco

did so, and the BWC recording reflects that the following exchange then occurred:

> DeMarco: Yeah, you know what she told me.

> Padilla: Yeah.

> DeMarco: Why do you want to lie to me? Come on, brother.

¶38      At that point, Padilla turned around and raised his hands over his head, telling DeMarco that he "might as well" arrest him.

¶39      Padilla argues that DeMarco's question "Why do you want to lie to me?" constituted hearsay because, he maintains, the question "conveyed a highly prejudicial impression to the jury to the effect that [Alyssa] said affirmatively that it was Padilla who was driving."[5]

¶40      "Hearsay is defined as a statement 'the declarant does not make while testifying at the current trial or hearing' that is 'offer[ed] in evidence to prove the truth of the matter asserted in the statement.'" *State v. Allen*, 253 Ariz. 306, 327, ¶ 27 (2022) (quoting Ariz. R. Evid. 801(c)). The hearsay definition thus requires an identifiable out-of-court assertion. Ariz. R. Evid. 801(c), *see* Ariz. R. Evid. 801(a) ("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."). "Statements offered for a purpose other than proving the truth of the matter asserted are not hearsay." *Allen*, 253 Ariz. at 327, ¶ 27 (citation omitted). "The burden is on the party claiming an assertion was intended, and ambiguous or doubtful cases will be resolved in favor of admissibility." *State v. Palmer*, 229 Ariz. 64, 67, ¶ 8 (App. 2012) (cleaned up).

¶41      "[A]n out-of-court statement admitted for the purpose of establishing what effect it had on the listener is not hearsay." *Allen*, 253 Ariz. at 327, ¶ 27 (cleaned up). Likewise, an out-of-court statement is not hearsay if offered to provide context for a party's responses. *State v. Fordson*, __ Ariz. __, ¶¶ 27-28, 555 P.3d 52, 58 (App. 2024) (rejecting defendant's hearsay challenge to admission of recording of conversation between defendant and his girlfriend; noting girlfriend's statements were not

---

[5] In his reply brief, Padilla argues, for the first time, that the admission of DeMarco's BWC recording violated his rights under the Confrontation Clause. By raising this argument for the first time in reply, Padilla waived it. *State v. Rumsey*, 225 Ariz. 374, 379, ¶ 15 n.4 (App. 2010).

hearsay because they were offered "to put [defendant's] responsive statements in context").

¶42 Here, DeMarco's question was not an "assertion" at all, and so did not constitute hearsay. Instead, the question was admissible to provide context for Padilla's statement that DeMarco "might as well" arrest him, which could, in turn, be construed as evincing consciousness of guilt. *See State v. Thompson*, 832 A.2d 626, 654 (Conn. 2003) (noting that defendant's statements at homicide scene, including "[j]ust arrest me," were "consistent with consciousness of guilt"). And even if DeMarco's question could be interpreted as an assertion, it was, at most, an assertion by *DeMarco*, not by *Alyssa*. DeMarco's question reflected DeMarco's belief that Padilla had lied when he denied driving that morning. Because DeMarco's question did not repeat or summarize any statement made by Alyssa, it is not hearsay. *State v. Chavez*, 225 Ariz. 442, 444, ¶ 8 (App. 2010) ("[W]ords or conduct not intended as assertions are not hearsay even when offered as evidence of the declarant's implicit belief of a fact.").

¶43 In support of his position, Padilla relied on unpublished decisions by appellate courts in North Carolina and Delaware. *See State v. Baldwin*, 643 S.E.2d 677, 2007 WL 1246418 (N.C. App. 2007) (unpublished table decision); *Ramirez v. State*, 27 A.3d 552, 2011 WL 3811581 (Del. 2011) (unpublished table decision).[6] In *Baldwin*, the trial court allowed an officer to testify at trial about a statement the defendant's stepmother made to him about the defendant's whereabouts at the time of the crime, 2007 WL 1246418 at *12, while in *Ramirez*, the court admitted the recording of the defendant's post-arrest interview in which the interviewer disclosed statements made by the defendant's family members. The *Baldwin* court and the *Ramirez* court both held that the admission of the hearsay statements was error. Here, by contrast, Officer DeMarco's BWC video contains no hearsay statements by Alyssa or any other non-testifying witness. *Baldwin* and *Ramirez* are thus inapposite. The court did not abuse its discretion in admitting the BWC recording.

---

[6] Arizona Rule of the Supreme Court 111(d) permits citation to unpublished decisions from another jurisdiction if "permitted in that jurisdiction." Delaware court rules do not prohibit citation to unpublished opinions, *see Case Financial, Inc. v. Alden*, Civ. Act. No. 1184-VCP, 2009 WL 2581873 at *6 n.39 (Del. Chan. Aug. 21, 2009) (noting that "unpublished opinions have precedential value" in Delaware), while North Carolina court rules permit citation to unpublished decisions in limited circumstances, including if there is no published opinion on point. *See* N.C. R. App. P. 30(e)(3).

### B. Juror Question

**¶44** Padilla claims that the court abused its discretion when it overruled his objection to the following question that a juror submitted to be asked of Officer DeMarco: "Is a witness seeing someone drive while intoxicated enough probable cause for an arrest?" Padilla argues the juror question was improper because it called for a legal conclusion and risked jury confusion. *See* Ariz. R. Evid. 403.

**¶45** "[T]he questioning of witnesses by jurors is left to the discretion of the trial court," and "the appellate courts will not reverse unless there is a clear abuse of that discretion." *State v. Taylor*, 25 Ariz. 497, 499 (App. 1976). "[T]he court may prohibit or limit the submission of [juror] questions to witnesses for good cause." Ariz. R. Crim. P. 18.6(e). Testimony in response to juror questions must be helpful to a trier of fact, and it must refrain from merely delivering legal conclusions that tell a jury how to decide a case. *Webb v. Omni Block, Inc.*, 216 Ariz. 349, 353, ¶ 12 (App. 2007); *see* Ariz. R. Evid. 701.

**¶46** Defense counsel objected to the juror's question because it concerned the issue of probable cause, "a much lower legal standard" than the "beyond a reasonable doubt" standard that the jury was to apply, thereby "risk[ing] confusion of what has to be done at this trial." Counsel also objected that the question called for "a legal conclusion . . . about what would constitute probable cause." The court overruled the objection and read the question, to which the officer answered, "Yes, it will."

**¶47** We agree that Padilla's objection should have been sustained. The question asked whether certain evidence suffices to establish probable cause, and therefore called for a legal conclusion. Nonetheless, the erroneous admission of evidence does not require reversal if the State establishes that the error was harmless. *See, e.g.*, *State v. Anthony*, 218 Ariz. 439, 446, ¶ 39 (2008). The erroneous admission of evidence may be harmless if, *inter alia*, the evidence was "superfluous" and so "could not have affected the verdict." *State v. Copeland*, 253 Ariz. 104, 116, ¶ 27 (App. 2022) (citation omitted).

**¶48** A trial witness cannot properly offer an opinion that the defendant is guilty, *Fuenning v. Superior Court*, 139 Ariz. 590, 605 (1983), or otherwise tell the jury "how to decide the case." *Webb*, 216 Ariz. at 353, ¶ 14. Here, however, Officer DeMarco's testimony in response to the juror's question did not tell the jurors that Padilla was guilty of the charged offenses, nor did it otherwise tell them how to decide the case. Moreover,

as the State correctly argues (and Padilla does not dispute), the court properly instructed the jury on the elements of the charged crimes, and the challenged testimony did not relate to any of those elements. Instead, the testimony related to the existence of probable cause for an arrest, a matter that was superfluous to the issues that the jury was required to consider. Because the challenged testimony did not tell the jurors how to decide any issue before them, the testimony could not have affected the verdict, and so its admission, though erroneous, does not require reversal. *See Copeland*, 253 Ariz. at 116, ¶ 27; *see also Payne*, 233 Ariz. at 519, ¶ 158 (holding that exclusion of evidence of defendant's post-incarceration conduct, though erroneous, was harmless because it would not have "affected any juror's decision").

### C.     Rule 20 Motion

**¶49**         Padilla argues that the court erred by denying his Rule 20 motion because, he maintains, there was no "substantial evidence" to prove him guilty of violating A.R.S. §§ 28-1381(A)(1) or -1381(A)(2).

**¶50**         A judgment of acquittal is appropriate only "if there is no substantial evidence to support a conviction." Ariz. R. Crim. P. 20(a)(1). "Substantial evidence . . . is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of [the] defendant's guilt beyond a reasonable doubt." *State v. Ellison,* 213 Ariz. 116*,* 134, ¶ 65 (2006) (citation omitted). Put another way, in reviewing the denial of a Rule 20 motion, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. West*, 226 Ariz. 559, 562, ¶ 16 (2011) (cleaned up) (emphasis in original). "Both direct and circumstantial evidence should be considered in determining whether substantial evidence supports a conviction." *Id*. "When reasonable minds may differ on inferences drawn from the facts, the case must be submitted to the jury, and the trial judge has no discretion to enter a judgment of acquittal." *State v. Lee*, 189 Ariz. 590, 603 (1997).

**¶51**         The denial of a Rule 20 motion is a question of law reviewed *de novo. Allen*, 253 Ariz. at 335, ¶ 69. When reviewing the denial of a Rule 20 motion, a court considers "the entire record, including any evidence [the] defendant may have later supplied." *State v. Bolton*, 182 Ariz. 290, 308 (1995); *see State v. Eastlack*, 180 Ariz. 243, 258 (1994) ("After making and losing a motion for a directed verdict, a defendant has the choice of resting on the motion or proceeding with his case. If he proceeds, he runs the risk

of curing any deficiency in the state's case through introduction of his own evidence.") (citation omitted).

### 1. Impaired to the Slightest Degree

**¶52** To survive a Rule 20 motion on the A(1) count, the State was required to present evidence sufficient to support a finding that on May 21, 2021, (1) Padilla drove or was in actual physical control of a vehicle; (2) Padilla did so while under the influence of, and impaired to the slightest degree by, intoxicating liquor; (3) Padilla was prohibited, at the time, from driving a vehicle that was not equipped with an IID; (4) Padilla knew or should have known that the IID restriction was in effect; and (5) the vehicle was not equipped with an IID. A.R.S. §§ 28-1381(A)(1), -1383(A)(1), -3319(D); *State v. Nelson*, 251 Ariz. 420, 423-24, ¶¶ 12, 18 (App. 2021). Padilla concedes that on May 21 he was prohibited from driving a vehicle that was not equipped with an IID, that he was aware of this prohibition, and that the Suburban was not so equipped. Further, Padilla admits that he was intoxicated when the police arrived at the scene that day. He argues, however, that the State presented "scant or no substantial evidence that [he] had driven" the Suburban (or any other vehicle) that day and, in any event, the State failed to present evidence "of even a slight degree of impairment."

**¶53** Ample evidence in the record supports a finding that Padilla drove the Suburban on the morning of May 21. Padilla's neighbor R.L. reported seeing Padilla drive the Suburban up and down the street at about 8:15 that morning. Although Padilla contends that R.L. was not a credible witness in view of their "longtime adversarial relationship" and because the Suburban's tinted windows would have impeded his "ability to observe clearly who was driving," the credibility of R.L.'s testimony was a matter for the jury to determine. *See State v. Fischer*, 242 Ariz. 44, 50, ¶ 19 (2017) ("It is primarily the province of the jury to determine the credibility of witnesses and to find the facts."). R.L.'s testimony alone constitutes sufficient evidence to warrant a determination that Padilla was driving that morning. *See State v. Saez*, 173 Ariz. 624, 628 (App. 1992) ("If reasonable persons may fairly differ as to whether certain evidence establishes a fact in issue, then such evidence must be considered as substantial.") (cleaned up).

**¶54** Additional evidence that Padilla drove the Suburban on the morning of May 21 includes Melissa's statements to that effect to law enforcement that day, the presence of the Suburban's keys in Padilla's pocket, and the fact that no third party was present at the scene who could have driven the Suburban instead of Padilla. Although Padilla insists that his wife was "discredited" as a witness because at trial she "recanted" her

contemporaneous statements to the police, the jury was not required to reject Melissa's contemporaneous statements simply because she later recanted them. *See State v. Cox*, 217 Ariz. 353, 357, ¶ 27 (2007) ("No rule is better established than that the credibility of the witnesses and the weight and value to be given to their testimony are questions exclusively for the jury.") (citation omitted); *see also State v. Valdez*, No. 2 CA–CR 2022–0053, 2024 WL 324296, at *2 (Ariz. App. Jan. 29, 2024) (mem. decision) (explaining that "no authority hold[s] that, when reviewing the sufficiency of the evidence on direct appeal, we may choose which of a recanting witness's version of events is credible or that a trial court may do so in determining whether to submit a matter to the jury").

¶55 Finally, the jury could disbelieve Padilla's testimony about how he returned home on the morning of May 21 based on his failure to call his sister, his brother, or his brother's girlfriend as witnesses to corroborate his testimony. *See State v. Vargas*, 251 Ariz. 157, 177, ¶ 71 (App. 2021) (citing "the well recognized principle that the nonproduction of evidence may give rise to the inference that it would have been adverse to the party who could have produced it") (citation omitted).

¶56 Likewise, ample evidence supports a finding that Padilla was impaired while driving that morning. Such evidence includes R.L.'s testimony that Padilla was driving "very slowly," Officer Kuntz's testimony that driving "under the speed limit" is a cue that indicates impairment, and Padilla's request that R.L. "hide" him "because the police were coming," a request that could be construed as an admission that he had driven the Suburban while impaired. *See*, *e.g.*, *State v. Swinburne*, 116 Ariz. 403, 413 (1977) ("We have consistently held that flight or concealment of an accused is properly admissible in evidence as a fact which may be considered by the jury and from which they may draw an inference, in the absence of any explanation, that the accused is guilty.").

¶57 Likewise, when Officer DeMarco told Padilla that he believed Padilla's denial that he drove that morning was a "lie," Padilla lifted his arms up as though he was to be arrested. When DeMarco told him he was not under arrest, Padilla said that DeMarco "might as well" arrest him. A reasonable jury could interpret Padilla's reaction to being confronted by DeMarco as evidence of a consciousness of guilt. *See State v. Arce*, 107 Ariz. 156, 161 (1971) (observing that "[i]t was the function of the jury to decide what reasonable inferences could be drawn from the evidence"); *see also Thompson*, 832 A.2d at 654 (noting that defendant's statement "[j]ust arrest me" was "consistent with consciousness of guilt").

¶58          Padilla argues that there is no substantial evidence to support a finding of guilt on the A(1) charge because there "were no reports, by witnesses or police, that Padilla engaged in erratic driving."

¶59          But "erratic driving" is not an element of the A(1) charge. *State v. Miller*, 226 Ariz. 190, 192, ¶¶ 9-10 (App. 2011) (holding the State need not produce evidence of "bad driving" for DUI conviction). Rather, the evidence need only be sufficient for a reasonable juror to determine, based on the totality of the evidence, that Padilla was "impaired to the slightest degree" at the time he drove a vehicle. A.R.S. § 28-1381(A)(1). Here, the jury could reasonably have found that Padilla was impaired while he was driving home in view of the signs of impairment he exhibited once he arrived. R.L. described seeing Padilla "staggering" at 8:30 or 8:35 a.m. on May 21, while the officers who arrived at the scene fifteen or twenty minutes later saw him struggle to maintain his balance. These observations indicate the impairment of Padilla's gross motor skills, which, as Grommes testified, means that his cognitive ability and fine motor skills were necessarily impaired as well.

¶60          Although Padilla claimed that all of his alcohol consumption occurred in the span of fifteen to twenty minutes after he arrived home that morning, the jury was not required to accept Padilla's testimony on this point. *State v. Pieck*, 111 Ariz. 318, 320 (1974) ("The jury is not compelled to accept the story or believe the testimony of an interested party."). The jury could have rejected Padilla's testimony that he chugged a fifth of vodka within twenty minutes or less of his return home in view of the controverting evidence, including the fact that the officers observed no vodka bottle at the scene, Padilla gave a different account of his drinking to the officers at the scene (when he claimed to have consumed vodka in the form of multiple 4-ounce shots), and Miller's testimony that a person who consumed a fifth of vodka within fifteen to twenty minutes would in all likelihood become physically ill or worse.

¶61          Moreover, the jury may have rejected Padilla's claim that all of his alcohol consumption occurred in the span of fifteen to twenty minutes after he arrived home in light of Officer Pellegrino's testimony that the signs of intoxication that Padilla exhibited did not grow more pronounced during the two hours Pellegrino spent with Padilla on May 21. As Grommes acknowledged in his testimony, a person who consumed, in fifteen or twenty minutes, enough alcohol to reach a BAC of .267 two hours later would exhibit "changes" in "balance" and "speech."

¶62　　　This Court "may not reverse a conviction for insufficiency of the evidence simply because another jury might have reached a different verdict." *State v. Rios*, 255 Ariz. 124, 131, ¶ 26 (App. 2023). Instead, "[i]f reasonable persons may fairly differ as to whether certain evidence establishes a fact in issue, then such evidence must be considered as substantial." *Saez*, 173 Ariz. at 628 (cleaned up). By citing to evidence that could support a judgment of acquittal, Padilla effectively asks us to reweigh evidence already considered by the jury and reach a different conclusion. This we will not do. *See State v. Williams*, 209 Ariz. 228, 231, ¶ 6 (App. 2004) (holding that conflicting evidence goes to weight and credibility, which is for the jury to decide). Thus, the court did not err by denying Padilla's Rule 20 motion as to Count One.

### 2.　　　BAC of .08 or More Within Two Hours of Driving

¶63　　　Padilla next argues that the court erred because the officers failed to perform his BAC blood draw "within two hours" of the alleged time of driving. A.R.S. § 28-1381(A)(2). Padilla claims the State failed to prove that his BAC "resulted from alcohol consumed either before or while driving" because it was possible that he had consumed the alcohol between being dropped off sober at the house and prior to Melissa's return. *Id*. Padilla also argues that because nobody witnessed him drink before getting into a vehicle or while he had been driving, the State failed to present substantial retrograde or other evidence to relate Padilla's BAC of ".08 or more" back to a time when he was "driving." *Id*. We disagree that substantial evidence was lacking.

¶64　　　"A defendant is presumed to be impaired from alcohol if his BAC is above the legal limit at the specified time interval." *Miller*, 234 Ariz. at 296, ¶ 9 (citations omitted). The statutory interval for a "per se DUI offense" in Arizona is designated as "within two hours of driving or being in actual physical control" of a vehicle. *Id*.; A.R.S. § 28–1381(A)(2).

¶65　　　Moreover, "retrograde analysis is generally considered to be a reliable scientific discipline." *Miller*, 234 Ariz. at 304, ¶ 54; *see State v. Peraza*, 239 Ariz. 140, 144, ¶ 7 (App. 2016) (noting that if breath tests occur more than two hours after driving, the state is required to relate the results back to the relevant time for the results to be admissible). The State "may still meet its burden of proving that [Padilla] had a BAC of [.08] or more within the two-hour period" by using "retroactive extrapolation" and relating Padilla's BAC back to within two hours of driving. *State v. Claybrook*, 193 Ariz. 588, 590, ¶ 14 (App. 1998) (citation omitted); *see also State v. White*, 155 Ariz. 452, 455 (App. 1987) (holding that jury could infer that

DUI defendant's BAC test reading of .234 one hour after arrest showed intoxication at time of arrest). The expert witness who presents BAC retrograde evidence "can be a police officer or the operator of the machine if properly certified and in addition possesses superior knowledge, experience and expertise on the question." *Claybrook*, 193 Ariz. at 590, ¶ 15 (citation omitted).

**¶66**        At trial, Padilla did not challenge Miller's qualifications as an expert or the methods she used when conducting her retrograde BAC analysis. *See* Ariz. R. Evid. 702. He does not dispute her determination that his BAC would have been at least .271 at 10:14 a.m. on May 21. Thus, the issue is whether there is substantial evidence that Padilla was driving within two hours of 10:14 a.m.

**¶67**        As discussed *supra* ¶ 53, R.L. testified that he saw Padilla driving the Suburban up and down the street around 8:15 a.m. Melissa's statements to law enforcement that day reflect that she saw Padilla pull the Suburban into their home's driveway shortly before she called 911 at 8:38 a.m. This evidence is sufficient to support a finding that Padilla drove after 8:14 a.m., and, therefore, within two hours of 10:14 a.m. The court did not err in denying Padilla's Rule 20 motion as to the A(2) charge.

**¶68**        Lastly, Padilla argues that police lacked probable cause to arrest him, and therefore his "consent" to submit to a blood test "is suspect and should be declared void." But Padilla never challenged the validity of the blood draw in the trial court, and so has forfeited this argument on appeal. *State v. Bush*, 244 Ariz. 575, 588, ¶¶ 49-52 (2018).

### CONCLUSION

**¶69**        For the foregoing reasons, we affirm Padilla's convictions and resulting sentences.



AMY M. WOOD • Clerk of the Court
FILED:    AGFV